IN RE: APPLICATION OF THE CITY OF RALEIGH (PARKS AND RECREA-
TION DEPARTMENT)

JEFFREY BEHRINGER AND WIFE, KATHY BEHRINGER; AND DAVID BURNETT
AND WIFE, DONNA BURNETT, PETITIONERS-APPELLANTS v. THE CITY OF
RALEIGH, RESPONDENT-APPELLEE

No. 9110SC440

(Filed 6 October 1992)

1. **Municipal Corporations § 30.6 (NCI3d) — outdoor amphitheater
   — nearby properties protected from noise — sufficiency of
   evidence to support finding**

   Evidence was sufficient to support the city council's find-
   ing that properties near an outdoor amphitheater would be
   protected from sound amplification when the evidence tended
   to show that seating and orientation of seating was placed
   to minimize sound amplification and lighting to nearby proper-
   ties; certain safeguards were installed to protect the sound,
   including eight-inch thick concrete walls, double overhead doors,
   and six-inch thick acoustical insulation; and statistical data
   with regard to expected noise and its dissipation supported
   the finding.

   **Am Jur 2d, Buildings § 8.**

2. **Municipal Corporations § 30.6 (NCI3d) — outdoor amphitheater
   — no substantial adverse effect on surrounding properties —
   sufficiency of evidence to support finding**

   Applicants for a permit to build an outdoor amphitheater
   presented substantial evidence to support the conclusion that
   the facility and activities conducted would not have a substan-
   tial adverse effect on the surrounding properties where such
   evidence tended to show that the facility was separated from
   surrounding properties by an interstate highway, city park
   property, a floodplain/wetlands area, vacant properties, and
   two sixty-foot buffer zones which were to be planted to city
   landscape ordinance standards; additional parking spaces had
   been purchased to accommodate the additional traffic; develop-
   ment would not have a major impact on a floodway and flood
   fringe area in the park; the stage was situated to minimize
   sound amplification in the area; there was an extremely con-
   centrated effort to preserve the natural vegetation on the

IN RE APPLICATION OF CITY OF RALEIGH

[107 N.C. App. 505 (1992)]

site; and a traffic study concluded that the proposed amphitheater site was a good location which was well served by the existing roadway infrastructure.

**Am Jur 2d, Buildings § 8.**

3. **Municipal Corporations § 30.6 (NCI3d) — outdoor amphitheater — no substantial reduction of value in neighboring property — sufficiency of evidence to support finding**

Evidence was sufficient to support the city council's conclusion that an outdoor amphitheater facility would not substantially reduce the value of the property in the surrounding neighborhood.

**Am Jur 2d, Buildings § 8.**

4. **Municipal Corporations § 30.21 (NCI3d) — special use permit — notice and opportunity to be heard — due process afforded petitioners and public**

Respondent city council afforded petitioners notice and an opportunity to be heard in the process of issuing a permit for the building of an outdoor amphitheater where a notice of public hearing was published on 22 September 1990; an evidentiary hearing was held on 2 October 1990 and held open until 16 October 1990; at the hearings the council heard testimony from all persons desiring to testify; and representatives from Parks and Recreation, the city planning director, and a representative of the project sponsor met with citizens on 8 October 1990.

**Am Jur 2d, Buildings § 8.**

5. **Municipal Corporations § 30.21 (NCI3d) — special use permit — enthusiastic city council members at hearing — no showing of bias**

The mere fact that a decision maker enters a hearing with knowledge of the subject matter of the hearing does not lead necessarily to the conclusion that the decision maker's mind is closed to evidence and set as to the final result. In this case although the record reflected the city council's enthusiasm for an outdoor amphitheater, their pre-hearing "participation" did not reflect impermissible bias on the part of the city council in the permit process.

**Am Jur 2d, Buildings § 8.**

## IN RE APPLICATION OF CITY OF RALEIGH

[107 N.C. App. 505 (1992)]

APPEAL by petitioners from judgment and order entered 28 December 1990 by *Judge Howard E. Manning, Jr.*, in WAKE County Superior Court. Heard in the Court of Appeals 10 March 1992.

*Andrew W. Olsen for petitioner appellants.*

*Associate City Attorney Elizabeth C. Murphy for respondent appellee.*

COZORT, Judge.

On 17 September 1990 the City of Raleigh Parks and Recreation Department (applicant) filed an application for a special use permit to construct an outdoor amphitheater in Walnut Creek Park. On 2 October 1990 the Raleigh City Council (Council) held a public hearing to consider the application. The hearing was continued until 16 October 1990 at which time the Council issued the special use permit. Petitioners are citizens who own property adjacent to or in close proximity to the amphitheater. Petitioners filed a petition for certiorari in superior court. The request was granted on 6 December 1990. The matter was heard on 17 December 1990 and the judgment and order of Judge Howard E. Manning, Jr., affirming the action of the Council was filed on 28 December 1990. Petitioners appeal. We affirm.

N.C. Gen. Stat. § 160A-381 (1987) authorizes the Council to issue special use permits and provides for superior court review of the Council's decision. In reviewing the Council's decision, both the superior court, sitting as an appellate court, and this Court are required to:

(1) [Review] the record for errors in law,

(2) [Insure] that procedures specified by law in both statute and ordinance are followed,

(3) [Insure] that appropriate due process rights of a petitioner are protected including the right to offer evidence, cross-examine witnesses, and inspect documents,

(4) [Insure] that decisions of town boards are supported by competent, material and substantial evidence in the whole record, and

(5) [Insure] that decisions are not arbitrary and capricious.

*Coastal Ready-Mix v. Board of Commissioners*, 299 N.C. 620, 626, 265 S.E.2d 379, 383 (1980). In determining the sufficiency of the evidence to support the Council's decision, we apply the whole record test which requires the examination of all competent evidence to determine if the Council's decision is based upon substantial evidence. *Henderson v. N.C. Dep't of Human Resources*, 91 N.C. App. 527, 530, 372 S.E.2d 887, 889 (1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and "is more than a scintilla or a permissible inference." *Lackey v. Dep't of Human Resources*, 306 N.C. 231, 238, 293 S.E.2d 171, 176 (1982). "[T]he court may not consider the evidence which in and of itself justifies the Board's result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Thompson v. Wake County Bd. of Educ.*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977).

On 19 June 1990 the Council adopted Raleigh City Code § 10-2072(m) which provided, in part:

> *Outdoor stadium, outdoor theaters, outdoor race tracks, of more than two hundred and fifty seats.* Following an evidentiary hearing conducted under the procedures contained in section 10-2094(d), outdoor stadiums, outdoor theaters, outdoor race tracks, and outdoor amphitheaters of more than two hundred fifty (250) seats shall be allowed . . . after the City Council finds that the evidence presented at the hearing establishes each of the following:
>
> 1. That the facility and activities requested to be conducted therein will not have a substantial adverse impact on surrounding properties including without limitation, stormwater, dust, smoke or vibration; and
>
> 2. That the practical limits of public facilities and services such as stormwater, water and sewer lines, streets, fire, public safety, and trash collection are considered and respected; and
>
> 3. That traffic generated to and from the site will not create unsafe or inefficient parking, loading, vehicular, and pedestrian circulation with consideration, among other things, to: the physical character of roads, the classification of roads, accident experience near the site, traffic volumes existing

and projected from approved site plans and subdivisions, interference with any other driveway, response time of nearby emergency services such as fire and hospital; and

4. That visual separation or barriers are provided which lessen the perceived height and bulk of proposed structures as seen from nearby residential neighborhoods; and

5. That nearby properties are protected from sound amplification and lighting; and

6. That the facility and the activities conducted therein will not substantially reduce the value of property in the neighborhood; and

7. That off-street parking in accordance with 10-2061 *et seq.* is provided in the amount of one space for every five (5) seats or every five (5) persons in designated capacity of assembly place; and

8. That the site is not located in a primary watershed protection area.

On 16 October 1990, the Council concluded that the proposed amphitheater met all the above requirements and issued the special use permit. The superior court concluded that there was substantial evidence to support the Council's decision that each of the conditions had been met.

On appeal petitioners argue the trial court erred in finding that (1) there was sufficient evidence to support the Council's finding that the nearby properties would be protected from sound amplification and lighting; (2) there was sufficient evidence to support the Council's finding that the facility would not substantially reduce the value of the property in the neighborhood; (3) there was sufficient evidence to support the Council's finding that the facility would not have a substantial adverse impact on the surrounding properties; (4) that due process was afforded to petitioners and the public in connection with the special use permit process; and (5) that the special use permit for the amphitheater was issued pursuant to law where no representative of the area outside the City was present on a planning agency making a recommendation or decision.

[1] First, petitioners argue that the applicant did not present competent, material, or substantial evidence that the nearby

residences would be protected from sound amplification and lighting. Respondent counters that the evidence presented by Planning Director George Chapman, by architect Abe Sustaita, and in the sworn application was competent, material, and substantial evidence to support the Council's conclusions. The application states: "The siting and orientation of the facility will protect nearby properties from sound amplification and lighting." Although the statement in the application is conclusory and of no evidentiary value, we find the other evidence sufficient to support the Council's conclusion.

We first note that the record presented the evidence in summary fashion, rather than a verbatim transcript. The summary presentation made review difficult; use of a verbatim transcript of the testimony would facilitate appellate review of questions regarding the sufficiency of the evidence.

Planning Director Chapman presented the conclusions of the City Staff that the site plan met all required conditions for approval with the exceptions of conditions 1, 5, and 6 set forth in § 10-2072(m). As to those conditions, Staff recommended the Council take into account the testimony in the evidentiary hearing. Specifically as to lighting and sound, Staff also noted that

> Lighting for the facility will not exceed .4 footcandles. Details of lighting height have not been determined at this time.
>
>        *  *  *  *
>
> Seating and orienion [sic] of seating is placed to minimize amplification and lightng [sic] to to [sic] nearby properties. There are several residential properties located south of the site on both sides of Holloway Drive, approximately 600 feet from the amphitheater and 200 feet from the nearest parking.

Architect Abe Sustaita testified

> they have taken into consideration some of the issues including environmental issues. He stated sound will be contained pointing out they have oriented the facility so that the broadcast will be away from the residents. He stated the nearest residential unit is approximately 6,000 linear feet away. He stated they have investigated the prospect of what would happen when the sound leaves the facility. He stated they believe this facility is exempt from the noise ordinance, however they are putting in safeguards to protect the sound including 8-inch

thick concrete walls, double overhead doors, 6-inch thick acoustical insulation, etc. He indicated sound to the rear of the facility is hardly audible in the rest of the park.

In addition to the above testimony, the Council also considered the following evidence presented at an 8 October 1990 meeting as summarized in an interoffice memorandum:

The typical level of sound for rock music as indicated by an independent acoustical study prepared for PACE is 110 decibels (dB(A)) at the mixing console approximately 70 to 100 feet from the stage. Due to the eight (8) inch thick concrete walls which comprise the stage, the sound levels are rapidly dissipated to the rear (south) of the stage. Due to the northwest orientation of the stage the sound will travel approximately 2,000 feet to the beltline which is the northern boundary of the property. These distances will reduce the sound levels. The grassed sloped seating area slopes upward resulting in additional rductions [sic] of the sound levels to the northwest. A chart from Site Planning by Kevin Lynch was discussed to compare decible [sic] levels with common sources and perceptions of sound. . . . Comparing the chart of sounds with the levels which are projected for the amphitheatre decible [sic] levels at the southern property line should be in the range of ordinary conversation or slightly above and levels at Rockwood and Providence Road (Green Valley subdivision) would be substantially below this level.

Several citizens expressed their concern about the sound control, the level of decibels expected from the amphitheater, and the lack of statistical data concerning the decibel levels. Taking into account both the evidence supporting and contradicting the Council's decision, we conclude that applicants presented substantial evidence to support the conclusion that the nearby properties would be protected from sound amplification and light.

[2] Next, petitioners argue there was insufficient competent, material, and substantial evidence to support the Council's conclusion that the amphitheater would not have a substantial adverse impact on the surrounding properties. Respondent counters that the application, the minutes of the evidentiary hearing, and the traffic study support the Council's conclusion. Applicant states in the application:

**IN RE APPLICATION OF CITY OF RALEIGH**

[107 N.C. App. 505 (1992)]

It is anticipated that this project will have no substantial adverse impact on surrounding properties. The amphitheatre has been sited and oriented in order to minimize visual and acoustical impacts to adjoining properties. Sound from the stage area will be projected to the northwest toward the Beltline. The facility is separated from residential properties to the north by the Beltline and existing City park property, a distance of approximately 1.2 miles. The stage structure will consist of solid masonry construction with a solid membrane roof system which will minimize sound projection to the south. In addition, a buffer yard of 60 feet in width will be provided along the southern boundary and will be planted to City of Raleigh Landscape Ordinance standards. The facility will be buffered to the east by an extensive floodplain/wetlands area adjacent to Walnut Creek. The adjoining properties to the west of the facility are vacant. A buffer yard of 60 feet in width will be provided along the western boundary and will be planted to City of Raleigh Landscape Ordinance standards.

In addition to the previously summarized testimony presented by architect Abe Sustaita, landscape architect Jimmy Thiem testified that additional parking spaces had been purchased to accommodate the additional traffic; development of the property took into account a floodway and flood fringe area in the park, and the development would not have a major impact on those areas; the proposed location was the best considering the wetlands, elevation, and sewer service; there had been an extremely concentrated effort to preserve the natural vegetation on the site; and additional buffering along the southern and western property had been added. Applicant also presented a traffic study which concluded that "the proposed amphitheater site is a good location which is well-served by the existing roadway infrastructure." Taking into account both the evidence supporting and contradicting the Council's decision, we conclude that applicants presented substantial evidence to support the conclusion that the facility and activities conducted would not have a substantial adverse effect on the surrounding properties.

[3] Petitioners further argue that applicants failed to present sufficient evidence to support the Council's conclusion that the facility would not substantially reduce the value of the property in the surrounding neighborhood. Respondent answers that the evidence presented in the application, and the evidence concerning the traffic, buffers and landscaping, light, water and sewer lines, streets,

IN RE APPLICATION OF CITY OF RALEIGH

[107 N.C. App. 505 (1992)]

public safety, trash collection, and visual separation from nearby properties is sufficient to support the Council's conclusion. Respondent further argues that since the evidence supports the conclusion that the facility would not cause substantial adverse impact to the surrounding properties, the evidence also supports the conclusion that the facility would not cause any decrease in the value of the property in the neighborhood. We note again the conclusory nature of the statement in the application that "[t]he construction of this facility will not reduce the value of the property in the neighborhood." We find, however, after reviewing the whole record, that there is sufficient evidence to support the Council's conclusion that the facility would not substantially reduce the value of the property in the surrounding neighborhood.

[4] Next, petitioners argue that the trial court erred in finding that due process was afforded to petitioners and the public in connection with the permit process. Specifically, petitioners first argue that the Council members were prejudicially biased for the project and considered information outside the hearing process without stating the source of their information or making the information available for cross-examination. As examples, petitioners point to statements made by two Council members after the end of the hearing but prior to the Council vote. Second, petitioners argue that the Council's participation and identification with the project, the City ordinance resting the decision concerning the special use permit application solely on the Council without recommendation from the Planning Commission or Board of Adjustment, the short notice given the neighborhood members, and the scarcity of evidence on key issues reflects a denial of due process.

Due process of law requires notice and the right to be heard before an unbiased and impartial decision maker. *See Crump v. Bd. of Educ. of Hickory Administrative School Unit*, 326 N.C. 603, 392 S.E.2d 579 (1990).

Bias has been defined as "a predisposition to decide a cause or an issue in a certain way, which does not leave the mind perfectly open to conviction," Black's Law Dictionary 147 (5th ed. 1979), or as "a sort of emotion constituting untrustworthy partiality." 10 C.J.S. *Bias* (1955 & Supp. 1989) (footnote omitted). "Some sort of commitment is necessary for disqualification [due to bias], even though it is less than an irrevocable one." 3 Davis, *Administrative Law Treatise* 2d § 19:4 at 385

(1980). Bias can refer to preconceptions about facts, policy or law; a person, group or object; or a personal interest in the outcome of some determination. *See id.* ch. 19.

*Id.* at 615, 392 S.E.2d at 585. In *Crump*, a case involving review of a school board decision, the trial court properly instructed the jury as follows:

> To prove impermissible bias of the hearing body the plaintiff must show or prove by its greater weight more than the fact that a board member or members had some knowledge of some fact or facts concerning a charge or charges against a teacher. Mere familiarity with a fact or facts or charge or charges does not automatically disqualify a board member as a decision maker.
>
> . . . .
>
> To find impermissible bias you, the jury, must find by the greater weight of the evidence that the mind of a board member was predetermined and was fixed and not susceptible to change prior to the deliberating process of the hearing board, and that the decision was not based solely upon evidence during the hearing.

*Id.* at 616, 392 S.E.2d at 585-86. The distinction between pre-hearing knowledge and bias is key. *Id.* at 616, 392 S.E.2d at 586. The mere fact that a decision maker enters a hearing with knowledge of the subject matter of the hearing does not lead necessarily to the conclusion that the decision maker's mind is closed to evidence and set as to the final result. *Id.* at 617, 392 S.E.2d at 586. If, however,

> there be facts within the special knowledge of the [decision makers] or acquired by their personal inspection of the premises, they are properly considered. However, they must be revealed at the public hearing and made a part of the record so that the applicant will have an opportunity to meet them by evidence or argument and the reviewing court may judge their competency and materiality.

*Humble Oil & Refining Co. v. Bd. of Aldermen of the Town of Chapel Hill*, 284 N.C. 458, 468, 202 S.E.2d 129, 136 (1974).

We find no violation of petitioners' due process rights. Raleigh City Code § 10-2094(d) (1989) provides in part that

IN RE APPLICATION OF CITY OF RALEIGH

[107 N.C. App. 505 (1992)]

(d) The following procedure is required for any quasijudicial evidentiary hearing arising under this chapter:

* * * *

2. Public notice by publishing or advertising notice of the hearing in a newspaper of general circulation in the city at least once and at least seven (7) days nor more than twenty-five (25) days before the date fixed for the hearing.

3. The city will make a reasonable attempt to notify by general mail all owners of property which is the subject of the action, the applicant, and all property owners immediately adjacent to or directly opposite the street from the subject property. . . .

4. The city will make a reasonable attempt to post a sign or signs on the subject property . . . .

5. Consideration of present physical conditions on the premises and in the vicinity.

The above provisions help insure that due process is afforded all interested parties. The record contains the notice of public hearing published 22 September 1990 and the notice of public hearing mailed to adjacent property owners. An evidentiary hearing was held on 2 October 1990 and held open until 16 October 1990. At the hearings, the Council heard testimony from all persons desiring to testify. Although the record does not reflect any cross-examination in the traditional sense by citizens, the Council is required only to provide the opportunity for persons to cross-examine witnesses. The record does not reflect that the Council denied any request to cross-examine witnesses presenting evidence in support of the project. In addition to the hearings on 2 and 16 October, the Parks and Recreation Director, another representative from Parks and Recreation, the City Planning Director, and a representative of the project sponsor met with citizens on 8 October 1990. We find that the Council complied with the above stated requirements and provided petitioners with notice and the opportunity to be heard.

[5] Having found that petitioners had notice and the opportunity to be heard, we turn our attention to the asserted bias of the individual council members. First we address the statements of Councillors Anne Franklin and Mary C. Cates. The transcript summary provides:

Ms. Franklin indicated she was hearing concerns different than what she had heard expressed before. She stated the people in the community would be subjected to the actual content or language of these concerts. *She stated she has been assured that the sound would not reach into the neighborhood.* She questioned if the City sets any type parameters as it relates to hearing the content and/or language of the concerts. . . . *Ms. Cates pointed out she recently attended a neighborhood meeting on sound barriers around the Beltline and they were using 67 decimal [sic] level.* (Emphasis added)

After reviewing the context of Councillor Franklin's statement, we cannot conclude that her mind was closed to the evidence and her vote predetermined. Moreover, as respondent argues, the statement may have been prompted by the evidence presented during the hearing process. Although Councillor Cates' statement may be considered "a fact within the special knowledge of a member" which should have been introduced during the body of the hearing, we also conclude that her statement does not indicate impermissible bias on her part.

We next address the alleged bias of the Council members who participated in the planning of the project. The record reflects that prior to the special use permit hearing, the Planning Commission recommended approval of the outdoor stadium ordinance and the Real Estate Committee recommended approval of the developer's plan to develop the project. The Council adopted an ordinance in connection with financing the cost of the amphitheater, approved the proposed operating agreement and development management agreement, adopted a resolution to notify the public of the intent to lease land, and authorized notice to be placed in the newspaper. The record contains no other indication of the participation by Council members in the project except as necessary to perform the above duties.

The superior court addressed petitioners' claims of Council bias stating in part:

Had the pre-planning process and careful thought not gone into the project, the City would be in court subjected to an attack and claims of lack of planning and irresponsible actions. To disqualify the members of the City Council on claims of pre-hearing bias because of previous knowledge or participation in the planning process of a municipal venture, such as

DEBNAM v. N.C. DEPARTMENT OF CORRECTION

[107 N.C. App. 517 (1992)]

the amphitheater, would gut and destroy the orderly and logical planning process which is now present in the City of Raleigh and other local governments.

Although the record reflects the Council's enthusiasm for the project, we do not find that pre-hearing "participation" reflects impermissible bias on the part of the Council. The Council functioned as authorized by law. We find no denial of due process.

Finally, petitioners contend the special use permit was issued in disregard of N.C. Gen. Stat. § 160A-362 (1987) because there was no representation on the Planning Agency and Board of Adjustment by residents of the extraterritorial area directly adjacent to the project site. This issue was not raised by petitioner before the superior court. Our rules do not provide for issues to be raised here for the first time. N.C.R. App. P. 10(b). This argument is dismissed.

The judgment of the trial court is

Affirmed.

Judges JOHNSON and GREENE concur.